The Surrogate.
On the alleged will of 1872 being presented for probate/Messrs. Samuel Sinclair, Charles Storrs and Richard H. Manning being the executors named in an earlier alleged will of the decedent, bearing date January 9, 1871, appeared and propounded such earlier will, and claimed that the will of 1872 was void for lack of testamentary capacity.
' The causes thus became consolidated, and the question to be determined was, which was the last will and testament ? The proponent of the last will and testament of 1872 caused the subscribing witnesses to that will to be examined, and made out a prima facie case for its establishment. The contestants then proceeded with evidence tending to show that the decedent was not, at the time of- its execution, capable of making a will, by reason of unsoundness of mind. At an early stage in the progress of the case, and after releases had been executed by all of the legatees and devisees named in the will of 1871, save the children of the deceased and the Children’s Aid Society, and after Miss Greeley had executed and delivered to her younger sister a conveyance of one equal half part of all the property claimed to have been disposed of by the will of 1872, the counsel of Miss Greeley and those of her sister objected that the contestants of the latter will had no longer any status in court, and no right to contest the same. In this I think they were wrong. Our statute (3 Rev. Stat., 5 ed. 146), provides that the executor, devisee, or legatee named in any last will, or any person interested, in the estate, may have the will proved. *395 Any interest, however slight, and even, it seems, the bare possibility of an interest, is sufficient to entitle a party to oppose a testamentary paper (Will. on Ex., 284; Dayt. Surr., 158, 159). The executors named in the will of 1871 have clearly, by statute, an express right to have that will proved, if they can establish the fact that it is the last will, and they may rightfully contend against the validity of any alleged subsequent will as an obstacle in the way of establishing the will under which they claim. Their interest in this regard is very apparent. For, if they can succeed in establishing their will, the title to the movable goods of the testator, though in ever so many different and distinct places, vests in them, in possession, &c.,—indeed, did so vest presently upon the testator’s death (Will. on Ex., 531). The probate, or letters testamentary, is merely operative as the authenticated evidence, and not at all as the foundation of the executor’s title; for he derives all his interest from the will itself, and the property of the deceased vests in him from the moment of the testator’s death (Dayt. Surr., 213, citing Will. on Ex., 255). If, however, the will of 1872 should be established as the valid last will, then the title would be elsewhere. Thus, the proponent and contestants are trying their alleged titles. Besides, the Children’s Aid Society, named in the will of'1871, had not released or abandoned its legacy, and had a right to expect the executors to look after its interests. At the close of the contest, and before exhausting the evidence on the part of the contestants, for alleged reasons, immaterial to the decision of the case, the counsel for proponent stated that under written instructions from his client, and sanctioned by her sister, any further effort to establish the will of 1872 was abandoned; that they withdrew from the controversy ; and he intimated a willingness that the will of 1871 should be admitted to probate. The counsel for the guardian ad litem did *396 not dissent from this suggestion. Thereupon the executors produced the usual formal proof of the execution of the will of 1871, and applied for letters testamentary thereon. It seemed to be considered by some of the. counsel that thus the will of 1872 and the- testimony, and all proceedings relating to it, had been withdrawn from this court. But this, I apprehend, could not be done in this or any case. The statute says:
“ That every surrogate shall carefully file and pre-. serve all affidavits, petitions, &c. (3 Rev. Stat., 365, § 14, 5 ed.). Upon proof being made of the due service of the citation, the surrogate, shall cause the witnesses to be examined before him. All such proofs and examinations shall be reduced to writing (Id., 148, § 56). The testimony taken by any surrogate in relation to the proof of any will shall be reduced to writing, and shall be entered by him in a proper book to be ■provided, and preserved as a part of the books of his office (Id., 167, § 75). The surrogate shall enter in his minutes the decision which he may make concerning the sufficiency of the proof- or the validity of any will which may be offered for probate, and if he find against it, shall state the ground upon which the decision is made, &c„ (Id., 150, § 69). The surrogate of each county shall provide and keep a' book in which shall be entered all minutes of proceedings,” &c. (Id., 365, § 13, subd. 4).
' It will be seen that the language of these provisions is imperative, and that the surrogate has no discretion on the subject. The testimony and proceedings cannot, therefore, be withdrawn, but must remain as part of the records and files of his office, and a decree must be made. It would, however, be competent for all parties, being adults, in such a case, at any stage of the proceedings, to enter into a stipulation to be entered on the minutes to authorize the court to make a decree *397 in pursuance of the terms of the stipulation. But here this difficulty in regard to any such adjustment is encountered : an infant is a party to these proceedings, and neither the guardian ad litem, or his counsel can. make' any admissions affecting unfavorably the interests of the infant. This is a well-established rule (James v. James, 4 Paige, 115 ; Bulkley v. Van Wyck, 5 Id., 536 ; Stephenson v. Stephenson, 6 Id., 353); and in the case of Moore v. Moore, Sandf. Ch., 37, the vice-chancellor ordered the testimony of an infant, taken in the cause under the objection of his guardian ad litem, to be stricken out. Perhaps the furthest the courts have gone in sanctioning the act of the guardian ad litem, in declining a contest in relation to the infants’ rights is the case of Levy v. Levy, 3 Mad., 245, but that case clearly has no application here. All these cases, as well as all • elementary works on the subject, indicate the tender solicitude with which all courts guard and protect the rights and interests of those whom the. law considers as incapable of managing their own affairs.
The consent, if such it may be considered, of the counsel for the proponent, speaking for both children, to allow the will of 1871 to be admitted to probate, would be tantamount to an ‘admission that the paper dated in 1872, and propounded as the last will and testament of the decedent, purporting to give a larger interest in his estate to his children than the will of 1871, is not, in fact, the last will, and ought to be refused probate.
Thus, it being inípracticable, as I have endeavored to show, to withdraw the proceedings relating to the will of 1872, and equally impossible to accept or consider any such admission that may have been made by, or in behalf of, the infant, it would seem to remain my duty to consider, however reluctantly, the case *398 upon its merits, and to.decide which, upon the testimony, shall be admitted and .which rejected.
In doing so, this embarrassing fact is encountered at the outset, that the testimony on either side is incomplete-and fragmentary, in so far as the will of 1872 is concerned. In the midst of the evidence on the part of the contestants, counsel for proponent, and for the infant, announced their withdrawal from the contest, pursuant to the request of those whom they represented, and proponent’s counsel signified his willingness to allow the will of 1871 to be admitted to probate. To this course no objection seemed to be made. The counsel for contestants' appears, therefore, to have assumed that no further evidence was necessary on his side, and the matter was, in this somewhat anomalous condition, and without argument by the learned counsel left to the court to determine.
In every case, a testator is presumed to -be sane. To this presumption is ' usually superadded the testimony of subscribing witnesses, generally non-experts, to the effect that they considered the testator to be of sound and disposing mind and memory. Here the subscribing witnesses testified to a compliance with the usual formalities by a person whom they considered of sound and disposing mind and memory. Thereupon, and without regard to any facts or circumstances occurring at any other time or place than the scene of the execution, the proponent was held to have made out aj'prima facie case, and the burden of proof was thrown upon the contestants to establish, the fact,°if they could, that some one or more of these formalities had not been complied with, or that the testator was incapable of making a will by reason of unsoundness of mind. They sought to assail its validity on the latter ground. It is, perhaps, unnecessary to detail, with any degree of minuteness, the testimony which the contestants *399 adduced with a view to establishing insanity. Suffice it to say that the intimate associates of the decedent observed, at least as early as November 1, 1872, in his acts, appearance, and conversation, indications of aberration of mind which gave them much concern; that this condition continued down to November 9, the day of the date of the will in controversy, on which day his conduct and language was of so marked a character as to leave no doubt of his insanity. The painful history, from this period down to about November 20, when he was removed, by his friends, to the private asylum of Dr. Choate, near Pleasantville, is furnished by the testimony, and there it ceases. From, that date to a few hours previous to his death, on November 29, "we have no direct evidence as to Ms bodily or mental condition. Upon this evidence, in connection with the peculiar provisions of the will, in the light of the fact, as alleged, that Grabrielle was, if anything, his favorite,.and the contrast between it and other wills theretofore made' by him, and the further fact that in it he nominates no ekecutor, when, in 1871, he had urged upon his friend, A. J. Johnson, as the chief reason why he should make a will, that he . could thus appoint his own executor, would seem to be the grounds upon which the contestant’s counsel relies, as establishing testamentary incapacity, and as so far overcoming the testimony of the subscribing witnesses as to again cast the onus probandi upon the proponent. In this I am inclined to believe he is right. To say the most of it, the evidence of the subscribing witnesses is very meagre and unsatisfactory when we consider the precedent facts. Here was a person who had manifested such palpable indications of unsettled reason as to cause his most cherished and intimate friends the liveliest anxiety; who was by their advice, and under their direction, doubtless, removed to the private asylum of an eminent physician, where the treatment *400 of diseases of the brain was made a specialty, and who remained under his treatment until the disease' culminated in death. At the time of the factum of the alleged will, and, indeed, during that day, no word was uttered by the dying man other than the monosyllables, “well,” “yes,” and “no,” in response to questions put to him. When first asked if the paper was.his last will and testament, he, it would seem, with his eyes closed, said, “no,” and, on the question being repeated in a different form, he opened his eyes, slightly raised his head, looked at it, and said, “yes.” When asked by Mr. Stuart if he would have him, who was one of his most intimate friends, as one of the witnesses, he said “no;” at which Mr. Stuart was so evidently astonished that he repeated the question by asking “Will you have me, John R. Stuart, witness it?” and the response was again “no.” I attach very slight importance to the incident of the hand-shaking with Mr. Reid. While all of these circumstances may be consistent with the soundness of a mind theretofore sane, they certainly, it strikes me, are not inconsistent with the continued unsoundness, when it has been once clearly' established. The onus was upon the proponent to remove any doubts upon the subject, were it practicable so to do.
The above scene, as the evidence shows,- occurred about an hour before the dissolution of the decedent, There is no evidence as to when this will was written, or as to the attendant circumstances, or as to where it was found, or that the decedent had any agency whatever in its production for formal execution, and I am not permitted to have the benefit of the. evidence of Dr. Choate, the professional expert under whose care and in whose house the patient was for nine days immediately prior to his death, and who was in the house at the time of the so-called execution of the alleged will. Under the peculiar facts of the case, had the parties *401 all been of age, the intendment would, in consequence, have been strongly against the proponent. On the other hand, because there is an infant party, principles of law cannot be relaxed, nor unwarranted inferences from evidence be made in her favor. In these respects the law knows no distinction of sex or age. “ Soundness and perfectness of mind are held, in law, to be absolutely requisite in the making of wills ; the health of the body merely not being regarded. If general insanity be proved, it is presumed to continue until a recovery be shown, and the party alleging a restoration to sanity must prove his allegation ” (Groble v. Barr, 5 Barr, 441).
With respect to persons of unsound mind having lucid intervals, it is sufficient if the evidence adduced in support of the will shall establish that the party af- • flicted had intermissions, and that there was an intermission at the time of the act; but the order of proof and presumption is thereby inverted. For where insanity is established, then the party who would take advantage of the act done, during an interval of reason must prove such act to have been so done (Cartwright v. Cartwright, 1 Phillim., 90). In this instance, we have the general insanity of the decedent' established, and no sufficient proof that at the time of the factum there was an interval of reason. Applying the above principles to the state of facts, it follows that the will of 1872 must be refused probate.
The will of 1871 having been duly proven, must therefore be admitted as the last will and testament of Horace Greeley,